851 F.Supp. 869 (1994)
David DAY, et al., Plaintiffs,
v.
NLO, et al., Defendants.
No. C-1-90-67.
United States District Court, S.D. Ohio, Western Division.
March 22, 1994.
*870 *871 *872 *873 Thomas Joseph Kircher, Kircher, Robinson, Cook, Newman & Welch, and Paul M. De Marco, and Allen Paul Grunes, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for plaintiffs.
William Howard Hawkins, II, Frost & Jacobs, John Stephen Wirthlin, Sr., Beirne & Wirthlin, Cincinnati, OH, Herbert L. Fenster, McKenna, Conner & Cuneo, Washington, DC, David M. Bernick, Kevin T. Van Wart, and Douglas James Kurtenbach, Kirkland & Ellis, Chicago, IL, for defendant.
ORDER OF CLARIFICATION OF PLAINTIFFS' CLAIMS AND SETTING STRUCTURE FOR TRIAL
SPIEGEL, District Judge.
This matter is before the Court on the Plaintiffs Class' Outline of Its Intended Trial Presentation (doc. 379), the Defendants' Brief Concerning Their Trial Presentation and Issues Raised by Plaintiffs' Trial Outline and Court's Proposed Trial Structure (doc. 380), the Defendants' Trial Proposal (doc. 381) and the Plaintiffs' Reply to Defendants' Brief Concerning Defendants' Trial Presentation (doc. 382).
In its Order dated January 3, 1994 (doc. 378), the Court directed the parties to submit a short trial outline. The Order stated that: "This outline will include a succinct description of the causes of action." Order at 1, Document 378. This litigation has now moved into its fifth year. During the last four years, it has been vigorously contested on both sides, both here and in the Sixth Circuit Court of Appeals. Over those years, the Plaintiffs have been less than precise in articulating their cause of action. In addition the Defendants have been successful in eliminating many of the Plaintiffs original claims. With trial on the merits scheduled in only a few months, it is necessary for the court to clearly articulate the issues to be tried in order to best organize trial proceedings.

INTRODUCTION
The evolving nature of the Plaintiffs' alleged injuries was recognized by the Court of Appeals:
First, this case is simply not ready for a definitive ruling on appeal because the causes of action have not been adequately defined through the adjudication process. Judge Spiegel recognized the evolving nature of plaintiffs' claims in an order issued after the statute of limitations trial, stating "both parties to this litigation appear to change their claims and defenses" as the case proceeds. 811 F.Supp. 1271, 1280 n. 9 (S.D.Ohio 1992). There is substantial evidence of such changes in the record. Plaintiffs' complaint alleges property damages and damage from emotional distress, but a number of the plaintiffs, including those whose claims were not held to be time barred, testified at the statute of limitations trial that they had not suffered property damage.[1] In his November 20th order, Judge Spiegel indicated that plaintiffs were claiming physical injury although no such injury was alleged in their complaint, and he dismissed all claims of the former employee sub-class except those involving intentional tort. He found that the other claims were covered by workers *874 compensation. It seems likely that the plaintiffs will seek to amend their complaint to reflect these changes. Until the nature of the claims is finally settled and a precise determination is made whether each state a claim, we cannot properly determine the applicable statute of limitations.
Day v. NLO, Inc., 3 F.3d 153, 154-55. However, we take some comfort in the fact that this case from the beginning has been difficult to neatly categorize. As this Court has observed a number of times, this case has involved novel, uncharted issues in the law. In essence, the alleged ramifications of twentieth century technology have forced this Court to consider a series of new issues in the law.[2]
When we turn to the Plaintiff Class' Outline of Its Intended Trial Presentation (doc. 379), we again find the Plaintiff Class reluctant to make a precise statement of their claims, beyond the general categories of "intentional tort" and "negligence". However, they have provided us, as directed, with a workable outline of the elements which they intend to prove.
The Defendants in their Brief Concerning Their Trial Presentation (doc. 380) continue to voice their opposition to our certification of this class. However, their objections are based at least in part upon some misperceptions of our intentions regarding the trial structure. We will address these concerns of the Defendants in the latter portion of this Order. In order to clarify the issues to be tried in this enormously complex case we offer the following history, trial structure and analysis.

A BRIEF HISTORY OF THIS LITIGATION
National Lead of Ohio (NLO) manufactured components of nuclear weapons needed for this country's armed forces at the Feed Materials Production Center (FMPC), located in Fernald, Ohio. The Plaintiffs, workers and frequenters at the FMPC, brought this lawsuit in 1990 against NLO, and its parent company National Lead Industries.
In 1991, the Defendants moved to dismiss this case based upon the statute of limitations. In considering this motion, this Court held that:
[b]ecause the plaintiffs allege that they have not yet suffered any physical injuries as the result of their exposure to hazardous levels of radiation, we find that the plaintiffs' claims for serious emotional distress, including the claim for fear due to an increased risk of cancer, are more properly viewed as claims for serious emotional distress unaccompanied by bodily injury. Therefore, these claims are governed by the four-year statute of limitations in Ohio Rev.Code § 2305.09.
Order, April 17, 1991, Document 46. The Court then held a trial on the issue of when the statute of limitations began to run. The jury found that some of the Plaintiffs were time-barred. Other Plaintiffs, however, were permitted to continue in their lawsuit. In light of the jury's determination, this Court certified a class to proceed in this case. In our Order Granting the Plaintiffs' Motion for Class Certification (doc. 281), we described the Plaintiff Class' claim in this manner:
The plaintiffs claim that the defendants operated the FMPC in such a way as to negligently or intentionally expose the *875 plaintiffs to dangerous levels of radioactive and hazardous materials. As a result of this alleged exposure, the plaintiffs contend that their personal property has been damaged and that they now suffer severe emotional distress in the form of increased fear of cancer.
* * * * * *
The plaintiffs in this action primarily seek relief in the form of a court-supervised medical monitoring program.
Order Granting the Plaintiffs' Motion for Class Certification (doc. 281).
In the fall of 1992, the Defendants moved to dismiss all of the Plaintiffs' counts, except for intentional tort. The Defendants based their argument upon the exclusive remedy provided under worker's compensation. The Court granted the Defendants' Motion, although it also allowed frequenters of the FMPC to proceed with their negligence claims. In granting the Defendants' Motion, the Court reasoned as follows:
In their Amended Complaint, the Plaintiffs allege that NLO released radioactive and other hazardous materials from the FMPC. Although the Plaintiffs have not specifically requested damages for personal injuries (other than emotional distress), the Plaintiffs have asked the Court to award medical monitoring. The Plaintiffs stated in their Complaint that medical monitoring:
is necessary to ascertain the extent of the adverse impact of Defendants' conduct on Plaintiffs and class members, and is the only way by which to determine such adverse impact, to determine the increased risk of harm associated with and emanating from Defendants' wrongful activities; and to protect the health and safety of Plaintiffs and class members ..
Accordingly, based upon the Amended Complaint, we conclude that the Plaintiffs are claiming physical harm in the form of increased risk of disease, emotional distress over the increased risk of disease, and disease itself.
Order Denying Motion to Reconsider, at 19 n. 9, November 20, 1992, Document 311.
The Defendants then moved for summary judgment, based in part on the contention that the Plaintiffs have not suffered severe and debilitating distress as a matter of law. The Court denied the Defendants' Motion for Summary Judgment, reasoning that the severe and debilitating requirement does not apply to emotional distress cases which are accompanied by physical injury:
the Plaintiffs are claiming in this lawsuit to have suffered physical injury as a result of a physical stimulus  being exposed to radioactive and other hazardous materials. Thus, the Plaintiffs are not only suing for their emotional distress, but also for the increased risk of disease and disease itself.
Order, January 11, 1993, doc. 327. Consequently, in light of the Plaintiffs' physical injury, the Court held that the Plaintiffs did not need to demonstrate severe and debilitating emotional distress.

TRIAL STRUCTURE
The Defendants have requested that we clarify the structure by which we intend to organize this trial. To use the Defendants' terms, we intend a deliberative, but not an evidentiary bifurcation. The parties will present their entire case to the jury. The jury will then be guided in steps through their deliberations by a series of special interrogatories. The threshold issue will be liability. For the employee subclass this will involve proof of intentional exposure to excessive radiation. For the frequenter subclass the issue will be negligent exposure.
A finding of liability for either class will require the jury to proceed to determine damages, if any. First, the jury will be asked to assess compensatory damages for the class representatives on their claims of emotional distress. This award will be made individually, with specific compensatory amounts, if any, for each class representative. If any of the representatives of the class is awarded compensatory damages, all of the passive members of that class will be eligible to submit their claims for compensatory damages. These claims will be adjudicated individually, in separate proceedings, after the close of the first trial. The structure of those proceedings will be determined, *876 if necessary, at a later time. In the subsequent adjudication of these individual damage claims by passive class members, the Defendants may be permitted to present their opposition, and to raise certain affirmative defenses.
Next, assuming a finding of liability for either subclass or for both, the jury will be asked to decide whether to award medical monitoring for the subclass(es). As explained more fully below, this will be a class wide determination for each subclass. Should the jury determine that either subclass is entitled to medical monitoring, it will also determine the amount to be awarded for such medical monitoring.
If the jury finds the Defendants liable and awards either medical monitoring to one or both of the subclass or compensatory damages to any class representative, the jury will be permitted to consider whether to award punitive damages. If the jury finds in favor of punitive damages, it will then determine the amount of Punitive Damages.
We have given careful consideration to the objections raised by the Defendants in their Brief Concerning Their Trial Presentation (doc. 380). We are satisfied that the trial structure we have chosen takes maximum advantage of the class action format in order to resolve those issues which are amenable to class wide determination. In addition we have reserved to individual determination, either by subsequent legal proceedings or by competent medical procedures, those issues too individualized for disposition on a class wide basis.

DISCUSSION

A. The Plaintiff Class' Case
As noted above, we have previously concluded that the Complaint, though obscure, satisfactorily states claims of increased risk of disease, emotional distress over an increased risk of disease, and disease, itself. The Plaintiffs' claims for disease itself cannot be sustained in this action. The Plaintiffs' claims for increased risk of disease are relevant only in respect to their claims for medical monitoring and for emotional distress.

1. Liability Under the Price-Anderson Act
This class action is brought under the Price-Anderson Act as amended in 1988 to create federal jurisdiction for public liability actions arising from an extraordinary nuclear occurrence. 42 U.S.C. § 2210(n)(2) (1988). As required by the Price-Anderson Act, the Plaintiffs' intentional tort and negligence claims both arise from their alleged exposure to dangerous levels of radiation. This is the source of our jurisdiction and the source of all the Plaintiffs' causes of action. The Defendants have objected that they anticipate that the Plaintiffs intend to introduce other claims:
"[P]laintiffs now promise to enlarge the trial by seeking to present a wide range of evidence relating to environmental and clean-up issues, [and] non-radioactive materials...."
Defendants' Brief at 2, Document 380. We reassure the Defendants that the trial will focus on the issue of exposure to dangerous levels of radiation, and nothing more.
The Court of Appeals has provided us with important background concerning the Act.
The Price-Anderson Act was enacted in 1957 as an amendment to the Atomic Energy Act to encourage private sector investment in the development of nuclear power by limiting the liability of private owners and operators in the event of a nuclear incident. Under the Act, private owners and operators are required to purchase a specified amount of insurance, and damages awards over and above that amount are then indemnified by the government. In August, 1988, Congress enacted the Price-Anderson Amendments Act of 1988, Pub.L. No. 100-408, 102 Stat. 1066 (1988), creating a federal cause of action for "public liability actions" arising from nuclear incidents. See 42 U.S.C. § 2014(hh). The federal courts were granted jurisdiction over these actions, and actions filed in state court were subject to removal. 42 U.S.C. § 2210(n)(2). The amendment was not intended to alter the state law nature of the underlying tort claims. It provides that "the substantive rules for decision in such action shall be derived from the law of the State in which *877 the nuclear incident occurs, unless such law is inconsistent with the provisions of such section." 42 U.S.C. § 2014(hh).
Day v. NLO, Inc., 3 F.3d 153, 154 n. 1 (6th Cir.1993).
The Plaintiffs, therefore, must prove liability under Ohio law. Their burden of proof differs with the two subclasses: former employees and frequenters. As we previously noted, because of the worker's compensation statutes, the employee subclass must prove that the Defendants intentionally exposed members of the subclass to excessive radiation, causing their injuries. See Order at 9-12, Document 311; Blankenship v. Cincinnati Milacron Chems., Inc., 69 Ohio St.2d 608, 433 N.E.2d 572, cert. denied 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982). The frequenter subclass of Plaintiffs, who are not subject to the restrictions of the worker's compensation statutes, intend to proceed on a negligence theory. They contend that the Defendants negligently exposed them to excessive radiation in dereliction of their duty to protect their life, health, safety and welfare, and in violation of applicable laws and regulations. These are the threshold issues in this case upon which liability is asserted. Accordingly, the jury will be asked, by means of special interrogatories, to determine liability. An answer in the affirmative for either subclass will require the jury to proceed to an assessment of damages for those Plaintiffs.

2. Actual Disease
In the beginning of this litigation, the Plaintiff Class asserted many claims, some of which have been excluded upon motion by the Defendants. However, the Plaintiffs did not in the beginning assert any claims for actual incidence of disease. As we noted above in our short recounting of the history of this litigation, the Plaintiffs requested class certification for property damage, emotional distress and medical monitoring. It was upon this basis that we certified the class. See Order Granting the Plaintiffs' Motion for Class Certification, Document 281. After the trial on the statute of limitations, claims for actual disease begin to appear. See Order Denying Motion to Reconsider, Document 327. As we noted above, this inconsistency was recognized by the Court of Appeals. We now will set the record straight. This action must be based on the claims upon which the Plaintiffs' Class was certified. They cannot expand their claims at this point. Therefore, any claims for cancer, claims for genetic abnormality and for other physical injuries by members of the Plaintiffs' Class will not be adjudicated and are specifically excluded from consideration in this case.[3] Conversely, they may be reserved for future litigation.

3. Emotional Distress
Although the Plaintiffs claims for actual disease will not be litigated, their claims for emotional distress will be squarely addressed. As noted, a jury has determined that the emotional distress claims by at least some Plaintiffs were not barred by the statute of limitations. The theory of the Plaintiffs' emotional distress claims is that their physical exposure to excessive radiation has resulted in an increased risk of cancer, causing them emotional distress. See Prosser and Keeton on Torts § 54, at 60 (5th Ed., Supp.1988) (explaining that many recent decisions have allowed recovery for fear of *878 future cancer, or `cancerphobia,' based upon the increased risk of cancer from exposure to a toxic substance.)
As we stated in a prior Order, the Plaintiffs' emotional distress need not be severe and debilitating in order to recover. The severe and debilitating requirement does not apply to emotional distress cases which are accompanied by physical injury. Binns v. Fredendall, 32 Ohio St.3d 244, 513 N.E.2d 278 (1987); see generally, Adkins v. Gen. Motors, 556 F.Supp. 452, 458 (S.D.Ohio 1983) ("under Ohio law, damages for intentional infliction of emotional distress are recoverable if contemporary physical injury was inflicted...."). In this case the Plaintiffs allege that they were exposed to radiation.
As the Defendants point out, mere exposure to a low dose of radiation is not the equivalent of a physical injury. O'Conner v. Commonwealth Edison Co., 748 F.Supp. 672, 678 (C.D.Ill.1990); Bubash v. Philadelphia Elec. Co., 717 F.Supp. 297, 300 (M.D.Pa. 1989). However, the Plaintiffs allege that they were exposed to high doses of radiation, doses high enough to cause an increased risk of cancer and cancer, itself. So, even though the Plaintiffs may not assert a cause of action for actual cancer, they must prove that on account of their exposure to high doses of radiation, they have experienced emotional distress in the form of a fear of cancer. They will be required to show that their apprehensions of developing cancer are reasonable. Lavelle v. Owens-Corning Fiberglas Corp., 30 Ohio Misc.2d 11, 13, 507 N.E.2d 476, 480-81 (C.P. Cayahoga Cty. 1987); see also Cantrell v. GAF Corp., 999 F.2d 1007 (6th Cir.1993) (citing Lavelle with approval). Consequently, the Plaintiffs must be allowed to present evidence which includes the risk of cancer. Id.
Thus, if the Plaintiffs can prove that they were exposed to sufficiently high dose of radiation, this in itself will constitute a physical injury, sufficient to bring their action for emotional distress based on their exposure. See Plummer v. United States, 580 F.2d 72, 76 (3rd Cir.1978) (prisoners who were exposed to active tuberculosis had sustained an impact sufficient to allow them to sue for their emotional distress about getting tuberculosis); Brafford v. Susquehanna Corp., 586 F.Supp. 14 (D.Colo.1984) (holding that chromosomal change without traditional adverse health effects constitutes physical injury); Ayers v. Jackson, 189 N.J.Super. 561, 461 A.2d 184 (Ocean Cty.1983) (finding that once a plaintiff ingests a harmful contaminant, they have suffered a "technical" physical injury, even though the Plaintiffs have not yet suffered from actual disease); Laxton v. Orkin Exterminating Co., 639 S.W.2d 431 (Tenn.1982);[4] Restatement (Second) of Torts § 7 (defining an injury as the invasion of any legally protected interest of another); but see Plummer v. Abbott Laboratories, 568 F.Supp. 920 (D.R.I.1983) (implying that ingestion of a product increasing the risk of disease is not a physical injury).
This Court's conclusion that a severe and debilitating requirement does not apply to the Plaintiffs' emotional distress claim follows the public policy rationale behind the law regarding emotional distress. Historically, courts were reluctant to allow compensation for mental injuries. See generally, Prosser and Keeton on Torts § 54 (5th ed. 1984). Courts feared a deluge of emotional distress claims, particularly fraudulent ones. Id. As courts began to recognize the deleterious effects of mental injuries, they began to allow compensation for emotional distress if the *879 emotional distress was accompanied by a physical injury. Id. at 363 (explaining that a physical injury makes it more likely that the plaintiff's emotional distress is genuine).
Subsequently, Ohio courts allowed recovery for purely emotional distress if the emotional distress was severe and debilitating. Paugh v. Hanks, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983). Just like a physical injury, the severe and debilitating requirement ensures that liability probably will not be affixed for emotional distress claims which are speculative or even fraudulent. See Robert A. Bohrer, Fear and Trembling in the Twentieth Century: Technology, Risk, Uncertainty and Emotional Distress, Wis. L.Rev. 83, 94 (1984). Similarly, in the case before the Court, assuming that the Plaintiffs have been exposed to excessive dosages of radiation, then we can reasonably conclude that no liability will be imposed for emotional distress claims which are fraudulent or speculative. See Terry Morehead Dworkin, Fear of Disease and Delayed Manifestation Injuries: A Solution or a Pandora's Box?, 53 Fordham L.Rev. 527, 542-58 (Dec.1984) (recovery allowed for emotional distress, when the emotional distress can be sufficiently verified); see also Plummer, 580 F.2d at 76 (exposure to disease constitutes a physical impact because the exposure guards against feigned emotional distress claims).[5]

4. Increased Risk and Medical Monitoring
Having clarified the Plaintiffs claims for emotional distress, we now turn to the Plaintiffs claims for "increased risk of disease." Traditionally, Courts have refused to allow recovery for "risk of disease." As one Ohio Court has held:
Simply stated, to permit recovery for the increased risk of cancer would be to allow speculation.
Not only must the injury complained of, and for which damages are sought, be the direct, proximate, and probable result of the wrong, and not a remote consequence, but the injury, and the damages resulting, must be shown with certainty, and not be left to speculation or conjecture, whether the action is in contract or tort; damages which are uncertain, speculative, or conjectural cannot be recovered. 30 Ohio Jurisprudence 3d (1981) 24, Damages, Section 14.
Moreover, evidence that pain, suffering, or a condition "might" or "may" result from the injury complained of is incompetent; the evidence must tend to show that reasonable certainty of such result exists. See Cooper v. Sisters of Charity (1971), 27 Ohio St.2d 242, 249-252, 56 O.O.2d 146, 150-51, 272 N.E.2d 97, 102-04. Plaintiff, through his medical expert, must prove probabilities, not possibilities.
Lavelle v. Owens-Corning Fiberglas Corp., 30 Ohio Misc.2d 11, 13, 507 N.E.2d 476, 478-79 (C.P. Cayahoga Cty. 1987); see also Cantrell v. GAF Corp., 999 F.2d 1007 (6th Cir. 1993) (citing Lavelle with approval).
However, there is one circumstance under which courts have traditionally permitted recovery on the chance that an injury has been sustained. When liability has been established courts have allowed for compensation for reasonable medical procedures incurred in an attempt to establish whether a plaintiff has been injured, even when those procedures prove that the plaintiff has not in fact been injured. See Friends For All Children v. Lockheed Aircraft Corp., 746 F.2d 816, 825 (D.C.App.1984). In these cases the traditional concern about allowing recovery for "risk of injury" do not exist. Id. Responsibility for procedures required to discover whether an injury has occurred are a reasonable consequence of tort liability. It is from this well accepted allowance for recovery of diagnostic procedures subsequent to a tort that courts have developed the remedy of medical monitoring.
Recognition that a defendant's conduct has created the need for future medical monitoring *880 does not create a new tort. It is simply a compensable item of damage when liability is established under traditional tort theories of recovery.
Potter v. Firestone Tire and Rubber Co., 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 823 (1993). In order to understand how medical monitoring squares with traditional tort law, the court in Friends for All Children, an air-crash mass tort action, offers a now often quoted simple illustration.
To aid our analysis of whether tort law should encompass a cause of action for diagnostic examinations without proof of actual injury, it is useful to step back from the complex, multi-party setting of the present case and hypothesize a simple, everyday accident involving two individuals, whom we shall identify simply as Smith and Jones:
Jones is knocked down by a motorbike which Smith is riding through a red light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that the undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.
From our example, it is clear that even in the absence of physical injury Jones ought to be able to recover the cost for the various diagnostic examinations proximately caused by Smith's negligent action.
746 F.2d at 825 (1984); Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 977-78 (Utah 1993); Potter, 863 P.2d at 824, n. 26. When a physician orders reasonable tests to determine the existence or extent of injuries suffered by a victim of a tort, these tests have traditionally been compensable. In addition, where periodic future medical treatment, including tests, are required these have traditionally been granted as compensable future medical expenses.
In recent years medical science has come to understanding that certain exposures can cause a disease with a protracted latency period, which may not manifest itself for many years. Under these circumstances a prudent physician could order preventative measures and periodic future testing, in order to have the best opportunity for early detection and treatment of the full blown disease, if and when it might manifest itself. It is the combination of the traditional tort policy of compensation for reasonable diagnostic procedures and the medical understanding of diseases with protracted latency periods that have led courts to order prospective medical monitoring, where liability is clearly established and medical experts assure the necessity and value of the monitoring procedures.
From a certain perspective this remedy seems to violate the courts traditional reluctance to allow recovery for "risk of injury." However, the courts concerns over damages which are uncertain, speculative, or conjectural are overcome by the reasonableness of compensation for diagnostic tests in cases where liability has been established. The safeguard against speculative recovery is the reasonableness of the procedures ordered in light of the tortious act. For example, as a result of Mr. Jones' hypothetical motorcycle accident, head x-rays would be completely reasonable, while a test for cholesterol in the blood would probably not be. In any case, the reasonableness of the tests is one the court can adequately adjudicate in light of expert testimony, with minimal risks of uncertain, speculative or conjectural recoveries.
The court in Friends For All Children, having demonstrated that medical monitoring was simply the extension of traditional tort theory to modern medical practice, proceeded to further clarify the nature of injury involved and the proof necessary to establish the injury. 746 F.2d at 826. The court first cites the Restatement (Second) of Torts which defines injury as an "invasion of any legally protected interest of another." See Restatement (Second) of Torts § 7. The court concludes that
[i]t is difficult to dispute that an individual has an interest in avoiding expensive diagnostic examination just as he or she has an interest in avoiding physical injury. When a defendant negligently invades this interest, the injury to which is neither speculative nor resistant to proof, it is elementary *881 that the defendant should make the plaintiff whole by paying for the examinations.
Friends For All Children, 746 F.2d at 826.
Therefore, it is sufficient for the Plaintiffs in the case at bar to show by expert medical testimony that they have increased risk of disease which would warrant a reasonable physician to order monitoring. The Supreme Court of Utah has recently stated that
[b]ecause the injury in question is the increase in risk that requires one to incur the cost of monitoring, the plaintiff need not prove that he or she has a probability of actually experiencing the toxic consequences of the exposure. It is sufficient that the plaintiff show the requisite increased risk.
Hansen v. Mountain Fuel Supply, 858 P.2d 970, 979 (Utah 1993); Potter, 863 P.2d at 824 (holding "that recovery of medical monitoring damages should not be dependent upon a showing that a particular cancer or disease is reasonably certain to occur in the future").
There are a number of sound policy reasons for allowing recovery of medical monitoring costs. Some have been clarified in Potter, which involved a toxic landfill. In that case the California Supreme Courts listed four public policy considerations in granting medical surveillance:
First, there is an important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease, particularly in light of the value of early diagnosis and treatment for many cancer patients.
Second, there is a deterrence value in recognizing medical surveillance claims....
Third, "[t]he availability of a substantial remedy before consequences of the plaintiffs' exposure are manifest may also have the beneficial effect of preventing or mitigating serious future illness and thus reduce the overall costs to the responsible parties."
Finally, societal notions of fairness and elementary justice are better served by allowing recovery of medical monitoring costs. That is, it would be inequitable for an individual wrongfully exposed to dangerous toxins, but unable to prove that cancer or disease is likely, to have to pay the expense of medical monitoring when such intervention is clearly reasonable and necessary.
Potter, 863 P.2d at 824 (citations omitted). Therefore, if the Plaintiffs can establish liability and an increased risk of disease, they will be entitled to medical monitoring.
The Defendants have directed our attention to several important decisions clarifying the law in regard to medical monitoring. Defendants' Brief at 11, Document 380. As the citations above indicate, we have found these cases to be instructive. In particular the Defendants argue that "[n]ot only do these cases confirm that such claims turn on individualized proof of exposure and risk, but they demonstrate that claims for medical monitoring cannot be used to recover costs for the kind of routine health surveillance that is characteristic of the In re Fernald monitoring program." Id. at 12. We remind the Defendants that the monitoring program they refer to was the result of a settlement into which they freely entered. This court and the Court of Appeals have made no secret of their recognition that this litigation may be resolved through a settlement. See Day v. NLO, Inc., 3 F.3d 153, 155 (6th Cir.1993).
Moreover, we are aware of the limits of recovery allowed through the remedy of medical monitoring. The monitoring must be directed toward the disease for which the tort victim is at risk, and will only include procedures which are medically prudent in light of that risk as opposed to measures aimed at general health. See Potter, 863 P.2d at 825. On this basis the Defendants renew their argument against disposition of this issue in respect to the entire class. We do not share the Defendants' concerns. The type and cost of medical monitoring appropriate in this case will be established by the evidence and determined by the jury under appropriate instructions. If the Plaintiffs can prove that the Defendants exposed them as a class to excessive radiation, then the Plaintiffs' claims for diagnostic testing *882 and case review by competent medical professionals cannot be contested.

5. Burdens of Proof and Evidentiary Considerations
In reviewing the parties proposed lists of witnesses we find significant overlapping and redundancy. We will address this issue specifically in a subsequent Order. However, having reviewed what the Plaintiffs must prove in order to establish liability and to demonstrate damages, we find significant similarities which will make the presentation of this case much more manageable than it may at first glance appear.
First, the elements which the Plaintiffs must prove in order to establish liability for intentional tort are virtually the same as those which are required to validate their claim for punitive damages. Under the Van Fossen test the Plaintiffs must demonstrate:
(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;
(2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employees will be a substantial certainty and not just a high risk; and
(3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous work.
Van Fossen v. Babcock & Wilcox Co., 36 Ohio St.3d 100, 101, 522 N.E.2d 489 (1988) (syllabus at 5).
The standard that the jury will use to determine whether to award punitive damages will be virtually the same as the standard for intentional tort. Since all of the Plaintiffs' claims are based on an allegation of tortious acts which took place prior to the enactment of Ohio Revised Code Section 2315.21, the common law of punitive damages will be followed. See Akron-Canton Waste Oil v. Safety-Kleen, 81 Ohio App.3d 591, 607, 611 N.E.2d 955 (Summit Cty.1992). Under Ohio common law, in effect at the time of the alleged injuries, punitive damages could be awarded for acts of a defendant characterized by a "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Preston v. Murty, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987) (paragraph one of the syllabus). In order to award punitive damages the jury must find the requisite "conscious disregard" by a preponderance of the evidence. Villella v. Waikem Motors, 45 Ohio St.3d 36, 38 n. 2, 543 N.E.2d 464 (1989).[6] The Plaintiffs' frequenter subclass will have to establish the elements of their punitive damages claim in addition to their proof of negligence. However, the heart of the Plaintiffs' case is the allegation of knowing and deliberate exposure to excessive amounts of radiation. The effects of that overexposure, if proven, would be the same for a contract worker as for a NLO employee. Under Ohio common law, if the jury decides that punitive damages are warranted, the jury will then assess the amount of punitive damages to be awarded. Id. at 39-41.
Second, the Plaintiffs claims are based on allegations of physical injury by exposure to excessive radiation which increased their risk of disease. Plaintiffs claim this increased risk of cancer caused and is causing emotional distress and reasonably necessitates medical monitoring. Evidence of increased risk of cancer will be used to prove both emotional distress and the reasonableness of medical monitoring.
In order to prove emotional distress the Plaintiffs must show that because of exposure to overdoses of radiation, they have *883 developed a reasonable fear of contracting cancer. See Lavelle v. Owens-Corning Fiberglas Corp., 30 Ohio Misc.2d 11, 13, 507 N.E.2d 476, 478-79 (C.P. Cayahoga Cty. 1987); see also Cantrell v. GAF Corp., 999 F.2d 1007 (holding "[e]vidence of an increased risk of cancer is relevant to whether a plaintiff's fear of cancer is reasonable, as required by Lavelle").
In order to prove the need for medical monitoring, the Plaintiffs will have to present medical evidence that they have been overexposed to radiation and that they have such a increased risk of cancer that a reasonable doctor would recommend medical monitoring of their condition. See Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 979 (Utah 1993) In Hansen the Supreme Court of Utah provides a thorough examination of the evidentiary issues of increased risk involved in the proof of a medical monitoring claim. Evidence necessary to justify an award for emotional distress and for medical monitoring both involve the proof of a substantially increased risk of disease. The correspondence and interrelationship between these two elements should facilitate the presentation of evidence and will allow the reduction of the number of witnesses necessary to present this case.

CLASS CERTIFICATION
In the Defendants' Brief Concerning Their Trial Presentation (doc. 380), they renew their concerns about how the trial can fairly achieve a result applicable to the entire class. Partially, this is based upon an incomplete understanding of our anticipated trial structure. Those concerns have been addressed in the outline of our intended structure, which we have explained above. In particular, we have described provisions for the individual adjudication of claims for compensatory damages. These should assure the Defendants that we have no intention of calculating awards by extrapolation. Class-wide verdicts will be allowed only in regard to liability, punitive damages and medical monitoring.

A. Typicality and Class Representation
However, the Defendants also renewed their objection to our initial certification of the class, and raise due process objections to any class wide determination. See Defendants' Brief at 5, Document 380. Though we have addressed the Defendants' concerns in our Order Certifying the Class (doc. 281), we shall revisit the question now in light of our proposed trial structure.
A class action is a procedural device, that can accomplish significant judicial economy. 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 1.01 (1992). The Supreme Court has recognized that class certification advances "the efficiency and economy of litigation which is a principal purpose of the procedure." General Tel. Co. v. Falcon, 457 U.S. 147, 159, 102 S.Ct. 2364, 2371, 72 L.Ed.2d 740 (1982) (quoting American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 553, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974)). Equally important as judicial economy are considerations of the avoidance of the inequality resulting from piecemeal litigation as well as a concern to provide access to the courts for litigants with limited resources and common claims.
The justification that led to the development of the class action includes the protection of the defendant from inconsistent obligations, . . . the provision of a convenient and economical means of disposing of similar lawsuits, and the facilitation of the spreading of litigation costs among numerous litigants with similar claims.
United States Parole Commission v. Geraghty, 445 U.S. 388, 402-03, 100 S.Ct. 1202, 1211-12, 63 L.Ed.2d 479 (1980). We have found all of these justifications, here listed by the United States Supreme Court, present in the case at bar.
In a class action a representative or representatives with typical claims can sue for the class when the question is of common or general interest to persons so numerous as to make it impracticable to bring them all before the court. Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356, 363-64, 41 S.Ct. 338, 341, 65 L.Ed. 673 (1921). Where the class representatives are well chosen, the *884 procedure affords a protection to the rights of the absent, "which would satisfy the requirements of due process...." Hansberry v. Lee, 311 U.S. 32, 43, 61 S.Ct. 115, 119, 85 L.Ed. 22 (1940).
The Defendants continue to assert that "the evidence in this case is too individualized to enable the claims and defenses in this case to be resolved by means of a single class-wide determination." Defendants' Trial Proposal at 1, Document 381. But if the Plaintiffs' claims have merit, then the Defendants should not be able to circumvent the efficient adjudication of these claims by focusing on the difficulty of individualized proofs. We have determined that the claims of the class representatives are typical of the class. The typicality requirement is intended to assure that the representatives' claims are similar enough to those of the remaining class members, so that the representatives will adequately represent the class. See General Tel., 457 U.S. at 157, n. 13, 102 S.Ct. at 2370, n. 13.
The Defendants claim that the differences between class members as to the work they performed, the duration of their employment and their personal health habits make class adjudication impossible. As our intended trial structure indicates, we realize the need to consider these factors in awarding compensatory damages. But there are common elements of law and fact that make this case appropriate for class certification. In this regard we have taken guidance from the Sixth Circuit Court of Appeals' decision in Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1197 (6th Cir.1988). In that case, the Court of Appeals approved the certification of a class of residents who claimed personal injuries and property damage allegedly caused by a chemical waste burial site. The court citing numerous cases stated:
Numerous ... courts have recognized the increasingly insistent need for a more efficient method of disposing of a large number of lawsuits arising out of a single disaster or a single course of conduct. In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.
Sterling v. Velsicol Chemical Corp., 855 F.2d at 1197 (footnote omitted). The focus of the case at bar is the behavior of the Defendants. Fundamentally, all claims rest upon the same alleged misconduct. Therefore, we are confident that the issue of liability is one best litigated by the class as a whole.
We are also convinced that should the jury find liability, it will also be appropriate for that jury to render a class wide verdict on the question whether medical evaluation is appropriate for all class members. A finding of liability makes it reasonable for the tort victim to seek a diagnostic evaluation to determine the extent of his or her injuries, if any, and to devise a course of treatment, if required. The extent and duration of diagnostic monitoring is a matter for medical professionals under the supervision of the court to decide. Viewed in this light, class adjudication of the right to medical monitoring is preferable.
The only other class wide verdict which we envision allowing the jury to render, if appropriate, is for punitive damages. Of all the issues to be decided in this case, the issue of punitive damages is the least dependent upon the individual differences between Plaintiffs. "Punitive damages `are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence.'" International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 48, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974)); see also Prosser and Keeton on Torts § 2 at 9-15 (5th ed. 1984); Memphis Community School District v. Stachura, 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986) ("The purpose of punitive *885 damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior."). As one district court has stated:
Punitive damages are not measured solely by the "bodily injury suffered" by a plaintiff, rather imposition of punitive damages is determined according to other factors such as the outrageousness of the injurious act, the defendant's motives and intent, and the nature and extent of the harm to the plaintiff.
In re Air Crash Disaster at Gander, Newfoundland, 684 F.Supp. 927, 931-32 (W.D.Ky. 1987). The award of punitive damages focuses upon the conduct of the Defendants. In this case that proof, as we have noted, is very similar to the issue of liability for intentional tort. Therefore, for the same reasons it is fitting that the question of punitive damages be determined class wide.

B. Rule 23(b)(2) Certification and Injunctive Relief
In certifying a class, first the Court must establish the four elements of numerosity, commonality, typicality, and adequacy of representation under Rule 23(a). Then the Court must proceed to certify under one of three of the subsections of Rule 23(b). This case is certified under Rule 23(b)(2) as explained in our Order Granting Plaintiffs' Motion for Class Certification (doc. 281). Rule 23(b)(2) states in pertinent part:
(b) Class Actions Maintainable. An action may be maintained as a class action if ...:
* * * * * *
(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole;
Therefore, it is clear that the primary purpose of a class action under Rule 23(b)(2) is to provide injunctive relief. This is consistent with the reasons we gave when we granted class certification.
The plaintiffs in this action primarily seek relief in the form of a court-supervised medical monitoring program. The defendants contend that such relief does not constitute injunctive relief because the defendants will simply be required to pay money to finance the program. Therefore, the defendants claim, this is simply an action for damages, and rule 23(b)(2) is inapplicable.
* * * * * *
However, a court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data produced utilized for group studies. In this situation, a defendant, of course, would finance the program as well as being required by the court to address issues as they develop during program administration. Under these circumstance, the relief constitutes injunctive relief as required by rule 23(b)(2).
Order Granting Class Certification, Document 281.
Both sections 23(b)(1) and 23(b)(2) do not allow for an opt out procedure and do not require notice to the class prior to judgment. Under these sections, as long as the other elements of class certification are in order, all of the members of the class are bound by the court's judgment. This is understandable. Certification under both sections 23(b)(1) and 23(b)(2) are narrowly drawn so that opting out is not appropriate. Section 23(b)(1) has language which resembles the language of compulsory joinder, that is, if the class is not certified, just resolution is impossible. This is because individual judgments would create conflicting burdens on the parties. Section 23(b)(2), under which the Plaintiffs' class is certified, is reserved primarily for injunctive relief. Opting out is generally not reasonable because plaintiff-by-plaintiff injunctive relief is not practical, particularly for the defendant. Section 23(b)(3) is more general. It basically requires only that the Court find that a class action be superior to piecemeal litigation of plaintiffs' claims. Section 23(b)(3) also requires notice and opt-out provisions. This is the preferred *886 section where monetary damages are the primary goal of the plaintiff.
Rule 23(b)(2), under which we have certified the case at bar, is not appropriate where final relief "relates exclusively or predominantly to money damages." See Advisory Committee's Notes to Proposed Rules of Civil Procedure, 39 F.R.D. 102. There is some disagreement concerning whether compensatory and punitive damages can be "appended" to a Rule 23(b)(2) claim, when they are supplementary to the main injunctive claim. Scholars have favored the allowance of some monetary claims:
The application of Rule 23(b)(2) to class actions requesting primarily declaratory or injunctive relief does not prevent the court from granting damages or other monetary relief to class members generally. Once the conduct of the defendant makes such injunctive or declaratory relief appropriated, the full panoply of the court's equitable powers is introduced.
Newberg on Class Actions, § 4.14.
If the Rule 23(b)(2) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2). Those aspects of the case not falling within Rule 23(b)(2) should be treated as incidental.
Wright & Miller, § 1775 (1986).
The most important ramification for the purposes of the current litigation concerns the necessity of pre-litigation notice to the class and opt-out provisions. The Manual for Complex Litigation and cases cited therein indicate that "the better view is that, if the conditions of (b)(1) or (b)(2) are met as well as those of (b)(3), the court is not required to give notice or to permit members to opt out."[7] Manual for Complex Litigation, Second, § 30.14; Penson v. Terminal Transport Co., 634 F.2d 989, 993 (5th Cir.1981) (holding that a member of a class certified under Rule 23(b)(2) has no absolute right to opt out of the class, even where monetary relief is sought and is made available); see also Reynolds v. National Football League, 584 F.2d 280, 283-84 (8th Cir.1978) (holding that when there is a choice between (b)(1) and (b)(3) certification, generally it is better to proceed under (b)(1) in order to avoid inconsistent adjudication or a compromise of class interests); In re Jackson Lockdown/MCO Cases, 107 F.R.D. 703, 711 (E.D.Mich.1985) (finding mandatory class preferable to opt out in prison riot class action where there were claims for both monetary and injunctive relief).
Applying these legal principles to the case at bar, we remain convinced that certification under Rule 23(b)(2), without opportunity to opt out, is most appropriate. The Plaintiffs' primary claim is for medical monitoring. The use of the Courts injunctive powers to oversee and direct medical surveillance is vastly superior to a lump sum monetary payment. Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 982 (Utah 1993) ("the use of a court-supervised fund to administer medical-surveillance payments ... is a highly appropriate use of the Court's equitable powers....") quoting Ayers v. Township of Jackson, 106 N.J. 557, 525 A.2d 287, 314 (1987); Potter v. Firestone Tire and Rubber Co., 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 825 (1993) (holding that court-supervised funds for medical monitoring for mass-exposure toxic torts cases best serve public health interests). A court supervised fund will also assure that the medical monitoring damages will be used to compensate for medical examinations and tests actually administered. Id. This will serve to limit the liability of defendants to the amount actually spent. Id. To administer medical monitoring piecemeal is unworkable. Therefore, *887 we are convinced that certification under Rule 23(b)(2), with no provision for opting out is required.
Furthermore, it should be seen from our discussion above that individual adjudication of punitive damages must also be avoided. Certainly punitive damages, if awarded, would be in the form of a monetary award. However, the focus of punitive damages is upon the defendant. To allow individual adjudication of punitive damages would surely result in grossly disparate and inequitable awards. Therefore, although monetary damages are involved, we believe that certification under Rule 23(b)(2) remains the correct choice in this case.
The requirement of notice and opt out provision in class actions is a due process concern. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812, 105 S.Ct. 2965, 2974-75, 86 L.Ed.2d 628 (1985) (expressly exempting class actions seeking injunctive relief from notice and opt out requirement). We have constructed the trial procedure to allow for the individual adjudication of all issues of compensatory damages. Each individual class member will have the opportunity to the full range of due process in his or her individual damages adjudication. Likewise, the Defendants will have the opportunity to present their case in opposition. No compensatory damages will be awarded without due process being afforded to all concerned. With these safeguards in place, we find no need for prior notice or opt out provisions. Therefore, the fact that the Plaintiffs are seeking monetary damages need not disturb our certification under Rule 23(b)(2).
A district court is afforded broad discretion in determining whether an action should be certified as a class action. Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1197 (6th Cir.1988); see also Hopper v. Schweiker, 596 F.Supp. 689 (M.D.Tenn.1984), aff'd, 780 F.2d 1021 (6th Cir.1985), cert. denied, 475 U.S. 1111, 106 S.Ct. 1522, 89 L.Ed.2d 920 (1986). As we stated at the beginning of this order, this case has required us to fashion innovative trial techniques. We have not in the past had the occasion to try a class action to completion. In fact very few class actions have been tried to completion in the United States. However, we feel confident that the procedures we have described herein will afford the parties their due process rights, while providing a just resolution of this matter.

THE REAL PARTY IN INTEREST
The Defendants in this case are being indemnified by the United States Government. The Department of Energy is paying the ongoing attorney's fees of the Defendants, and will be liable for any damage award, if the jury should so find, with the probable exception of punitive damages. In anticipation of the summary jury trial, we made an appeal to the DOE to become actively involved in that settlement procedure. Since the Sixth Circuit Court of Appeals issued its mandate against the summary jury trial, the DOE had no opportunity to participate, and has not appeared in any subsequent conferences. As noted above, this court and the Court of Appeals have recognized that this litigation may be resolved through a settlement. See Day v. NLO, Inc., 3 F.3d 153, 155 (6th Cir.1993). This is reinforced by the fact that the DOE settled the neighboring residents' lawsuit, In re Fernald, Case No. C-1-85-149. In addition the DOE is currently required to provide medical monitoring for current and former nuclear weapons plant employees. See National Defense Authorization Act of 1993, Public Law 102-484. Since medical monitoring is the primary remedy the Plaintiffs' Class is seeking, the DOE is in an particularly opportune position to view this matter in a global fashion.
Therefore, we renew our request that the DOE actively involved in this case. To that end, Defense counsel is ordered to provide within ten days of our signing, a copy of this Order as well as our Trial Management Order, issued this same day, to Secretary O'Leary, the Under Secretary of Energy responsible for this case, and the General Counsel of DOE.

CONCLUSION
We have carefully examined the Plaintiffs Class' Outline of Its Intended Trial Presentation (doc. 379), the Defendants' Brief Concerning *888 Their Trial Presentation and Issues Raised by Plaintiffs' Trial Outline and Court's Proposed Trial Structure (doc. 380), the Defendants' Trial Proposal (doc. 381) and the Plaintiffs' Reply to Defendants' Brief Concerning Defendants' Trial Presentation (doc. 382). We conclude that the Plaintiffs may proceed forward with under two theories of recovery: (1) that the Defendants intentionally exposed the Plaintiff subclass of former NLO employees to excessive doses of radiation, and (2) that the Defendants have negligently exposed the Plaintiff subclass of former NLO frequenters to excessive doses of radiation. The Plaintiffs are seeking court supervised medical monitoring, compensatory damages for emotional distress and punitive damages.
The trial in this matter will be conducted according to the structure described herein.
SO ORDERED.
NOTES
[1] Plaintiff Class has omitted any property damage claims from its Outline of Its Intended Trial Presentation.
[2] In a previous order we recounted the challenges this case has presented.

At its core, this lawsuit has posed difficult questions of how to deal fairly with an alleged mass tort while ensuring a just adjudication. One scholar aptly observed:
Nuclear power, toxic chemicals, pesticides, dangerous drugs and other products of twentieth century technology present our society, and consequently our legal system, with an enormous challenge.... The delicate balance between assuring safety and encouraging economic development and innovation is increasingly difficult to maintain.
Robert A. Bohrer, Fear and Trembling in the Twentieth Century: Technology, Risk, Uncertainty and Emotional Distress, Wis.L.Rev. 83 (1984). In this Order, and in previous Orders in this case, we have attempted to decide the motions before the Court justly and according to the law. We recognize, however, that this case does not fit into neat, nineteenth-century common law concepts. Rather, the alleged ramifications of twentieth century technology have forced this Court to resolve uncharted, novel issues in the law.
Order at 2, Document 327.
[3] As noted, our Jurisdiction over this case is based on the Price-Anderson Act, 42 U.S.C. §§ 2011-2286. Under this Act, a federal court has jurisdiction over any "public liability action arising out of or resulting from a nuclear incident ..." Id. at § 2210(n)(2). Congress defined a "nuclear incident" as any occurrence causing any "bodily injury, sickness, disease, or death, or loss of or damage to property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." Id. at § 2014(q).

As discussed in this Order, the Plaintiffs' claims for an increased risk of disease, and disease itself, are not viable claims. However, this Court does not lose jurisdiction over this case, because the Plaintiffs' claims of emotional distress still arise out of the bodily injury, sickness, disease, or death that the Plaintiffs allegedly suffered from as a result of excessive dosages of radiation. But see Building & Constr. Trades Dept. v. Rockwell Int'l Corp., 756 F.Supp. 492, 494 (D.Colo.1991) (reasoning that if the plaintiffs claims are not for bodily injury, sickness, or death, then there is no Price-Anderson jurisdiction).
[4] In Laxton, the court considered the plaintiff's negligence lawsuit alleging that the defendant contaminated the water supply with chlordane. The Supreme Court of Tennessee upheld the trial court's instruction to the jury:

[i]f [the plaintiffs] ingested any amount of the toxic substance, it is the judgment of the Court that that is at least a technical physical injury. But it is not an injury from which they are entitled to substantial damages under the facts of this case, that is from a physical injury. But, where there is any physical injury at all  any attendant mental pain and suffering is compensable. And so, I charge you that you may, if you find it supported by the proof, award to one or the other or each of the plaintiffs, such an amount as in your judgment would fairly compensate the plaintiffs for mental suffering as a result of reasonable apprehension of harmful effects to their own health and the health of their children, due to the ingestion of the toxic substances.
693 S.W.2d at 434.
[5] The Defendants might argue that too great a time lag exists between the alleged dosages of radiation and the subsequent emotional distress. However, as one scholar notes, "it should be irrelevant that the fear develops several years after ingestion, as long as the fear develops close in time to the gaining of knowledge of the carcinogenic properties." Terry Morehead Dworkin, Fear of Disease and Delayed Manifestation Injuries: A Solution or a Pandora's Box?, 53 Fordham L.Rev. 527, 555 (Dec.1984).
[6] The Ohio Supreme Court recognized that:

The quantum of proof which was required for an award of punitive damages at common law was a "preponderance of the evidence." Johnson v. Stackhouse Oldsmobile, Inc. (1971), 27 Ohio St.2d 140, 143, 56 O.O.2d 78, 79, 271 N.E.2d 782, 784. ... [T]he General Assembly recently enacted R.C. 2315.21(C)(3), which raises the quantum of proof required of the plaintiff to "clear and convincing evidence" in all cases where punitive damages are awarded, except where otherwise provided for by statute.
(Am.Sub.H.B. No. 1, effective January 5, 1988).
Villella, 45 Ohio St.3d at 38 n. 2.
[7] The Manual states that:

Many class actions satisfy the criteria of Rule 23(b)(3) as well as those of Rule 23(b)(1) or 23(b)(2). In such situations, the classification of the case plays an important role in defining the class, for putative class members have the right on timely request to exclude themselves from (b)(3) classes but not from (b)(1) or (b)(2) classes. This classification also determines whether notice is mandated by the Rule. Although the law is not settled, the better view is that, if the conditions of (b)(1) or (b)(2) are met as well as those of (b)(3), the court is not required to give notice or to permit members to opt out; in its discretion, however, the court may require notice under (d)(2) and perhaps allow exclusion on timely request.
Manual for Complex Litigation, Second, § 30.14.